FRED. KNOOP EX REL. JOHN MILLER, Respondent, v. NELSON DISTILLING COMPANY ET AL., Appellants.

St. Louis Court of Appeals, May 17, 1887.

1. FRAUDULENT CONVEYANCES—CHANGE OF POSSESSION, MATTER OF LAW, WHEN.—What delivery and change of possession of a chattel will satisfy the statute is a question of law where there is no substantial controversy as to the facts.

2. ——— CREDITORS, PRIOR AND SUBSEQUENT.—Prior or subsequent creditors of a vendor may attack a conveyance of chattels for fraud in not complying with the statute as to change of possession.

3. ——— PRACTICE—CONFLICT OF DECISIONS.—The Kansas City court of appeals having decided that section 2505, of the Revised Statutes, applies to subsequent creditors only, there is a conflict of decisions which makes it the duty of this court to certify this cause to the supreme court.

APPEAL from the St. Charles County Circuit Court, W. W. EDWARDS, Judge.

*Transferred to the supreme court.*

LOUIS H. BREKER, and MUENCH & CLINE, for the appellants: The cause should have been taken away from the jury. *Wright v. McCormick*, 67 Mo. 428; *Stewart v. Bergstrom*, 79 Mo. 524. The conveyance was a legal fraud as to creditors, prior and subsequent, and the court should so declare. Such has been the universal construction of our courts of section 2496, chapter 34, page 417, of the Revised Statutes. The language of

| | |
|---|---|
| 26a | 303 |
| 31a | 498 |
| 32a | 123 |
| 33a | 233 |
| 26 | 303 |
| 35 | 589 |
| 26 | 303 |
| 40 | 562 |
| 41 | 608 |
| 26 | 303 |
| 102m | 157 |
| 43 | 565 |
| 26 | 303 |
| 45 | 302 |
| 45 | 588 |
| 26 | 303 |
| 108m | 455 |
| 26 | 303 |
| 63 | 218 |
| 26 | 303 |
| 74 | 574 |

the section itself is too clear to admit of any other inter-
pretation. *Shaw v. Tracy*, 83 Mo. 224; *The State ex rel.
v. McBride*, 81 Mo. 349; *Crane v. Timberlake*, 81 Mo. 432;
*Stewart v. Nelson*, 79 Mo. 522; *Bohannon v. Combs*, 79
Mo. 305; *Stone v. Spencer*, 77 Mo. 356; *Shelley v. Boothe*,
73 Mo. 74. If, after the alleged sale, the vendor re-
mained in the apparent possession and control of the
goods, exercising apparent ownership and control over
the same, it makes no difference whether this was with
or without the consent of the vendee. The law only
takes notice of the facts as they appear to the public,
and this fact can not be known from mere rumor. Bump
on Fraud. Con. [2 Ed.] 112, 113, 114; *Claflin v. Rosen-
berg*, 42 Mo. 439; *Lesem v. Herriford*, 44 Mo. 323;
*How v. Taylor*, 52 Mo. 597; *Bishop v. O'Connell*, 56 Mo.
158; *Burgert v. Borchert*, 59 Mo. 80; *Wright v. McCor-
mick*, 67 Mo. 426.

C. DAUDT, for the respondent: The object of the
statute (sect. 2505) is to prevent the vendor from de-
riving a false credit from the continuance of his appar-
ent ownership. The law, for this reason, requires an
actual and continued change of the possession of the
things sold. It is, therefore, claimed that section 2505
does not apply in the present case. *Lesem v. Herriford*,
44 Mo. 324. The instructions given on behalf of the
defendant did not contain the modification required by
the statute, that, as to the change of the possession,
"regard must be had to the nature of the property."
*The State to use v. Schnake*, 21 Mo. App. 349.

THOMPSON, J., delivered the opinion of the court.

The Nelson Distilling Company sued out an attach-
ment against F. W. Stumberg, before a justice of the
peace. It was put into the hands of Fred. Knoop, a
constable, who executed it by levying upon a stock of
merchandise in the possession of Stumberg. John Mil-
ler, the relator, demanded these goods, claiming them
by virtue of a bill of sale from Stumberg to him, and,

thereupon, the constable demanded an indemnifying bond of the Nelson Distilling Company, which was given. The goods were retained by the constable, appraised, and sold, and the proceeds applied to the purposes of the attachment suit. This action is brought upon the indemnifying bond. The question at issue at the trial was, whether the bill of sale, under the circumstances, passed a title to Miller, which was good as against the other creditors of Stumberg, and whether there had been such an open, visible, and notorious change of possession as satisfied the requirements of section 2505, of the Revised Statutes, and the decisions of the supreme court thereunder.

Miller, who will hereafter be designated as the plaintiff, was the father-in-law of Stumberg. He testified to the effect that, when Stumberg married his daughter, which was in February, 1881, he bought the store, and the house and lot from Stumberg; that he gave Stumberg for the same five thousand dollars, which he paid in certain promissory notes; that he paid the money to Stumberg on these notes, from time to time, as the latter needed it. Stumberg was building, at the time, and needed the money. The plaintiff gave Stumberg the first money when the latter bought the lot. Stumberg paid seven hundred and fifty dollars for this lot, and the plaintiff gave him the other money as the building progressed. On the seventh day of August, 1885, which was the date of the bill of sale from Stumberg, under which the plaintiff claims, the plaintiff was security for Stumberg upon several promissory notes, amounting, in the aggregate, to the sum of two thousand eight hundred and twenty dollars. Stumberg was largely indebted, embarrassed, and the year before the date of the bill of sale, had solicited the plaintiff to take a conveyance of his property. The plaintiff had declined, advising Stumberg that trade might improve, and that he might pull through. In this state of things, Stum-

berg, on the seventh of August, 1885, executed to the plaintiff a bill of sale of his stock in trade, store fixtures, his safe, his horse, two cows, twelve hogs, one spring wagon, one buggy, and one set of harness, being, it appears, all the personal property which he had, for the consideration, as expressed in the bill, of two thousand dollars. On the same day Stumberg executed to the plaintiff a warranty deed of the house and lot, on which his store was situated, for the expressed consideration of three thousand dollars. The plaintiff, on receiving these conveyances, surrendered up to Stumberg five thousand dollars of the notes of the latter, which the plaintiff held, it seems, on account of the indebtedness of Stumberg to him for this property. On making these conveyances Stumberg immediately left for Kansas City. Both conveyances were recorded. There was no sign above the door of the store, but they attracted customers by means of what, in the testimony, is called a "show," that is, by placing articles of goods outside the store on the sidewalk. Upon the execution of the bill of sale, the "show" was taken in and was not again put out. The plaintiff directed his daughter, wife of Stumberg, to continue in the possession and to sell off the goods. The extent of the change of possession which took place, and the use to which the goods thus conveyed to the plaintiff was put, according to the plaintiff's testimony, can best be explained by quoting it: "When I got the bill of sale and deed, I took it to the recorder's office to have them recorded ; went back to the store and took possession ; told my daughter to sell the goods to the best advantage. * * * . I did not go to Stumberg first; he came to me. He came to my house on the sixth of August. These deeds were made on the seventh. We agreed at my house about the price. I did not know the value of the property at the time. He made the proposition, and I accepted. He wanted to sell a year ago, to me, but I told him to try another year. He did not tell me, when he was at my house,

that he owed other persons; he told me he could not make a living, nor pay the interest; that is why I bought. I knew that he was considerably in debt in bank, and on other notes, which I indorsed. I knew he owed Hackman one thousand five hundred dollars, on which note I was security. Stumberg came up in a buggy, and next day we came to St. Charles; got there about nine o'clock; we stopped at my daughter's and went direct to lawyer Daudt's office, where the papers were fixed. He handed me the deeds and I handed him five thousand dollars of his notes. I took the deeds to the recorder's office. After this I went down town and went to my daughter's house; Stumberg was with me. He took in the "show." By the word "show" I mean the goods placed on the outside, on the pavement, for exhibition. I told my daughter to sell at the best advantage, and as soon as she could. My son-in-law left that afternoon for Kansas City. In the evening I locked the door, and unlocked the store in the morning. Stumberg did not hand me the key in the morning; it remained in the door until I took it out in the evening. I staid at my daughter's house that night, and left next evening. After I opened the store next morning, my daughter came down, and I handed the key to her, and told her to sell for me. The goods looked the same after the bill of sale as before. No inventory was ever made of the goods, nor did I get an inventory, or ask for one; I trusted to them altogether. I closed the store and opened at the usual hour; the only difference, the "show" was taken in. My son-in-law nor daughter never rendered an account to me of the goods sold, nor did I ask it; I never told them to keep it. I told them to take out of the store whatever they needed. I gave them the privilege to take out of the store whatever they wanted. They kept no account of whatever they took. They did not render any account of what they took, nor did I ask them for it, nor did they pay me for what they took, nor did I ask it of them, nor did they

charge me anything for selling my goods. I came to town some four or five times, after the bill of sale. I asked Stumberg for money; he gave me twenty-five dollars, this is all I got of the sales. Mrs. Stumberg paid me money two or three times. After this first she gave me one hundred dollars, or one hundred and twenty-five dollars, or over. I gave it to Stumberg. I do not think I counted the money; my daughter said, 'Papa, here is one hundred and twenty dollars.' Before I went away I handed it to Stumberg again, and told him to pay notes on which I was security. The first time, I got twenty-five dollars, or thirty dollars; the second time, one hundred and twenty dollars, I got from my daughter. I do not know whether my son-in-law paid any of the notes or not, with this money. I never asked him. The next time, Stumberg paid me in the store something like one hundred dollars, did not count it, took his word for it. I told him to keep it until he got enough to pay a note on which I am security. I got something after this, but told them to keep it, about one hundred and twenty-five dollars or one hundred and thirty dollars. There were more offers to pay me money, but can not say how much. Three times, I am sure, they offered me money, besides the cash I got. My daughter offered me one hundred dollars, I did not take the money. I can not think of any more, kept no account. I was in the store three or four times since the bill of sale was executed, made short visits only. Since the sale I never asked them to keep an account, nor did they ever render an account to me. I have no idea how much the goods brought. When my son-in-law gave me the deed and bill of sale, I handed him five thousand dollars, my notes for which I held against him [meaning, it seems, Stumberg's notes, to the amount of five thousand dollars, which the plaintiff held]. I took the house and lot at three thousand dollars, and the store goods at two thousand dollars. I do not know whether the store was worth two thousand dollars; I took my

son-in-law's word for it.   I did not get that much ; I do not think that the goods brought more than five hundred or six hundred dollars.   *   *   *   The only cash money I kept from the proceeds of the sale was twenty-five dollars or thirty dollars, a few days after the sale bill was made.   I came to town with my wife ; we picked out quite a lot of goods for family use, about a spring wagon full, and took them home.   My boys got the hogs, cows, horse, wagon, and all other personal property, which I had bought from Stumberg, except the store goods."

Other testimony showed that, after the bill of sale, the business in the store went on as usual, except that they ceased purchasing country produce (with the exception of one transaction), and ceased purchasing goods to replenish the stock, but reduced the prices and sold the stock out in the course of about six weeks.   It is to be inferred, from the testimony, that Stumberg did not remain at Kansas City, but came back, and things went on ostensibly as before.   The plaintiff's name was not put up as a sign, but no secret was kept of the transfer.   A new book was procured, in which to enter the accounts kept with credit customers, and they were notified that the plaintiff would thereafter be their creditor, and the evidence shows that one of them objected to this.   Five witnesses testified to the effect that it was matter of common rumor, or knowledge, in the neighborhood, that the transfer had been made, but how the neighborhood acquired the knowledge does not appear.   The testimony is consistent with the idea that it was acquired from the recording of the bill of sale in the recorder's office.   The plaintiff was a farmer.   He lived at some distance from St. Charles, in the country. The leaving of the goods in the possession of his daughter and son-in-law, to close them out, as his agents, was consistent with the surroundings of his position ; since it would not be likely that a farmer would leave his business and come to town for such a purpose, if he

could avoid it. The testimony tends to show that the sum of two thousand dollars, named in the bill of sale as the consideration paid for the personal property, was nearly twice the cash value of the property.

An analysis of the testimony would lead to the conclusion that Stumberg was doing business entirely under cover of his father-in-law; that he owed his father-in-law for the house and lot on which the store stood, and for the stock of goods, to the extent of at least five thousand dollars; that, being embarrassed and unable to continue business, he solicited his father-in-law to take these conveyances, which the latter consented to do—giving up, as the consideration of the conveyances, five thousand dollars of the notes of Stumberg, which he held; that the father-in-law turned over the personal property conveyed in the bill, except the store goods, to his sons; that he carried away from the store a wagon load of the goods for his family use; but that, with this exception, he allowed his son-in-law and daughter to remain in custody as before, for the purpose of closing out the stock of goods, which consumed a period of about six weeks and realized five hundred or six hundred dollars; which money, with the exception of twenty-five or thirty dollars, was consumed by the son-in-law, with whom no account was kept, who paid nothing for rent, and received nothing for services, but sold the goods and used the proceeds for his own purposes—some of them, possibly, in paying off notes upon which the father-in-law was surety.

I.   Upon this state of the case the principal question pressed upon us is, whether the court ought to have taken the case from the jury, on the ground that the undisputed facts failed to disclose such a change of possession as satisfies section 2505, Revised Statutes. This statute reads as follows: "Every sale made by a vendor of goods and chattels in his possession, or under his control, unless the same be accompanied by a delivery in a reasonable time, regard being had to the situation of the

property, and be followed by an actual and continued change of the possession of the things sold, shall be held to be fraudulent and void as against the creditors of the vendor or subsequent purchasers in good faith.'' It has been repeatedly held by the supreme court, and by this court, that the " actual and continued change of possession,'' contemplated by this statute, must be open, notorious, and unequivocal, such as to apprise the community, or those accustomed to deal with the person, that the goods have changed hands, and that the title has passed out of the seller into the purchaser.  *Claflin v. Rosenberg*, 42 Mo. 439, 449 ; *Bishop v. O'Connell*, 56 Mo. 158 ; *Wright v. McCormick*, 67 Mo. 426, 429 ; *Burgert v. Borchert*, 59 Mo. 80 ; *Stewart v. Bergstrom*, 79 Mo. 524 ; *The State to use v. Donnelly*, 9 Mo. App. 519, 527.  The following language of Wagner, J., in *Claflin v. Rosenberg* (42 Mo. 439, 449), which is our leading case on the construction of the statute, will best explain what the supreme court mean by the construction, which they place upon it :  "This must be determined by the vendee using the usual marks and *indicia* of ownership, and occupying that relation to the thing sold which owners of property generally sustain to their own property.  There must be a complete change of the dominion and control over the property, and some act which will operate as a divestiture of title and possession from the vendor, and a transference into the vendee. This, necessarily, excludes the idea of a joint or concurrent possession.  It may not be essential, or indispensable, that the goods should be moved into a new or different house ; but there must be some open, notorious, or visible act, clearly and unequivocally indicative of delivery and possession, such as taking an invoice, putting up a new sign, or any other reasonable means, which would impart notice to a prudent man that a change had taken place.  The statute provides that the change shall be actual and continued ; it must, therefore, be neither formal nor temporary ; but, where the

whole law has been complied with, we see nothing to prevent the employment of the vendor to render services in and about the property, in the same manner as any other agent or employe." Upon the facts, above recited, we are obliged to hold that there was not such a change of possession as satisfies either the terms of the statute or this interpretation of it. There was not only no visible change of possession, but there was but a partial change in the beneficial ownership. With the exception of the goods, which the plaintiff took away, and the twenty-five or thirty dollars, which his daughter gave to him, the entire proceeds of the sale of the stock of goods appears to have been consumed by the vendor. The court should, therefore, have given the instruction which was requested, to the effect that the plaintiff was not entitled to recover ; the rule being that, where it appears from the undisputed facts that the change of possession was not such as the statute requires, the court should, as matter of law, declare the sale fraudulent. *Wright v. McCormick,* 67 Mo. 426 ; *Stewart v. Nelson,* 79 Mo. 524.

II. This will require us to reverse the judgment, unless another contention of the plaintiff is a sound one, which is, that the first clause of the statute (Rev. Stat., sect. 2505) applies only to *subsequent* creditors. It was, recently, so held by the Kansas City court of appeals, in the case of *Worley ex rel. v. Watson* (22 Mo. App. 546; 553). Notwithstanding the respect which we feel for the decisions of that court, we are constrained to hold that the word creditors, as used in the first clause of section 2505, refers to prior as well as to subsequent creditors of the vendor. As this difference of opinion between this court and the Kansas City court of appeals will require us to certify this cause to the supreme court, under section 6 of the recent constitutional amendment, adopted November 4, 1884, we shall proceed to state our reasons for our conclusion.

The statute, as at present enacted, contains two

clauses, relating to distinct subjects: the first clause to the necessity of a change of possession, in order to the validity of sales of goods and chattels, and the second clause to the necessity of an instrument of writing, duly acknowledged and recorded, where the sale takes place upon condition, although the possession is delivered to the vendee.   The first clause of the statute reads as follows:   " Every sale made by a vendor of goods and chattels in his possession, or under his control, unless the same be accompanied by delivery in a reasonable time, regard being had to the situation of the property, and be followed by an actual and continued change of the possession of the things sold, shall be held to be fraudulent and void, as against the creditors of the vendor, or subsequent purchasers in good faith."   The second clause reads as follows:   " And no sale of goods and chattels, where possession is delivered to the vendee, shall be subject to any condition, whatever, as against creditors of the vendee, or subsequent purchasers from such vendee in good faith, unless such condition shall be evidenced by writing, executed and acknowledged by the vendee, and recorded, as now provided in cases of mortgages of personal property."

The first clause of this statute has stood on our statute books since the revision of 1845.   The second clause was tacked on to the first by the legislature, by the act of March 15, 1877, amending the section as it stood in section 10, of chapter 107, of the general statute. Laws of 1877, p. 320.   The first clause of section 2505 has stood upon our statute books, without change, since the revision of 1865.   It was originally adopted by our legislature from the legislation of New York.   It seems to have come to us with an inheritance of conflicting opinions upon the question, whether the failure to deliver possession is conclusive, or merely *prima facie* evidence of fraud ; in other words, upon the question whether the failure to deliver possession, according to the terms of the statute, is what is termed a fraud, in law, or is

evidence from which a jury might infer an intent to defraud creditors.

In the revision of 1845, it read as follows: "Every sale, made by a vendor of goods and chattels in his possession, or under his control, unless the same be accompanied by delivery, in a reasonable time (regard being had to the situation of the property), and be followed by an actual and continued change of the possession of the things sold, shall be presumed to be fraudulent and void, as against the creditors of the vendor, or subsequent purchasers in good faith, and shall be conclusive evidence of fraud, unless it shall be made to appear to the jury, on the part of the person claiming under such sale, that the same was made in good faith, and without any intent to defraud creditors or subsequent purchasers." The statute, as thus framed, was construed to mean what it said, that, where the possession remained in the vendor, the sale was presumed to be fraudulent, unless the vendee, or other person claiming under the sale, should be able to satisfy the jury that the sale was made in good faith. Accordingly, while the statute stood in this language, as it did until the revision of 1865, the principal struggle, in cases of this kind, was over the question of the *bona fides* of the sale; for, although no change of possession had taken place, yet, if it could be shown that the sale was *bona fide*, and not a device concocted to hinder, delay, or defraud, creditors, it would stand; and it was necessary to satisfy the jury, not only that there was no fraudulent intent, but that there was some good and sufficient reason for leaving the property in the possession of the vendor. *Kuykendall v. McDonald*, 15 Mo. 416; *The State to use v. Smith*, 31 Mo. 566; *The State to use v. Rosenfeld*, 35 Mo. 472.

But the revisers of our statute law, in 1865, changed the reading of the section, so as to make it read precisely as the first clause of section 2505 of the revision of 1879 now reads. As the supreme court held in *Lesem v.*

*Herriford* (44 Mo. 324), " The only difference between the provisions in the statutes of 1855 and those of 1865 is, that, in the former, if the sale was not accompanied with an actual change of the possession, the sale was deemed to be, presumptively, fraudulent, though this presumption might be rebutted by proof of the fairness and honesty of the transaction; in the latter, where there is no actual change of possession, the rule of evidence is changed, and fraud is, conclusively, presumed."

All the decisions of the appellate courts of this state, so far as we have been able to find them, construing the first clause of section 2505, Revised Statutes, as it stands in the present, and as it has stood in the prior, revisions, have been examined, and, with the exception of the decision of the Kansas City court of appeals, in *Worley ex rel. v. Watson* (22 Mo. App. 546, 553), we find no intimation of the view that the word, creditors, is to be limited so as to apply to subsequent creditors only. We have included in this search the following cases, and fail to find, in any one of them, an intimation that the word, creditors, in the statute, should be thus limited in meaning: *Kuykendall v. McDonald*, 15 Mo. 416; *The State to use v. Smith*, 31 Mo. 566; *The State to use v. Rosenfeld*, 35 Mo. 472; *Claflin v. Rosenberg*, 42 Mo. 439; *Lesem v. Herriford*, 44 Mo. 323; *Bishop v. O'Connell*, 56 Mo. 158; *Burgert v. Borchert*, 59 Mo. 80; *Wright v. McCormick*, 67 Mo. 426; *Stern v. Henley*, 68 Mo. 262; *Mills v. Thompson*, 72 Mo. 367; *Stewart v. Nelson*, 79 Mo. 522; s. c., 79 Mo. 524; *Crane v. Timberlake*, 81 Mo. 431; *The State to use v. Donnelly*, 9 Mo. App. 519; *Winn v. Madden*, 18 Mo. App. 261, 266. In the earliest case, in which our supreme court appears to have been called upon to construe the statute (*Kuykendall v. McDonald*, 15 Mo. 416), the dates given in the statement of the facts in the opinion of the court show that the creditor attacking the sale was a creditor prior to the date of the sale. One of the judges of this court sat, at *nisi prius*, during two trials of the leading case of *Claflin*

v. *Rosenberg* (42 Mo. 439), in which the first clause of the statute, in its present language, received its first authoritative exposition. He distinctly remembers that the creditor in that case was one whose debt existed prior to the sale which was impeached. The short interval of time, which elapsed between the date of the sale and the date of the levy, in some of the other cases above quoted, strongly indicates that the creditor attacking the sale must have been a prior creditor of the vendor. Such was probably the case in *Stern v. Henley* (68 Mo. 262), where the interval was twelve days only; and it is extremely probable that such was the case in *Wright v. McCormick* (67 Mo. 426), where the interval between the two events was but two days. We are, therefore, satisfied that it has always been the understanding of the supreme court, and the general understanding of the courts of *nisi prius*, and of the profession, that this part of the statute applies both to prior and subsequent creditors; and, being of this opinion, we do not deem it necessary to extend our researches into the decisions of the state of New York, from whence we derive the statute, or into the decisions of other states where analogous statutes exist.

It can not escape attention, that the second clause of the statute, added to the first clause, as above stated, by the legislature, in 1877, relates to a subject which is quite distinct from the first clause. The second clause is a recording act; it rests upon the same considerations as other statutes requiring the registration of certain instruments of conveyance, and the settled construction of these statutes is, where not so expressed in terms, that they are intended to give notice to *subsequent* purchasers and mortgagees of the vendor of the change of title to the property, which has taken place. *Aubuchon v. Bender*, 44 Mo. 560, 564; *Davis v. Owenby*, 14 Mo. 170, 176; *McCamant v. Patterson*, 39 Mo. 100, 110; *Stillwell v. McDonald*, 39 Mo. 282; *Valentine v. Havener*, 20 Mo. 133. Parity of reasoning would require the term,

"creditors," when used in such a statute, to be limited to mean subsequent creditors. Upon this principle, we held, in *Defiance Machine Works v. Trisler* (21 Mo. App. 69), that the word, creditors, in the second clause of section 2505, Revised Statutes, means subsequent creditors. Our decision was approved by the Kansas City court of appeals, in *Tufts v. Thompson* (22 Mo. App. 564, 568). Although the second clause of the statute was added to the first as an amendment; although the second clause uses the words, "creditors of the vendee, or subsequent purchasers from such vendee in good faith," while the first clause uses the words, "creditors of the vendor, or subsequent purchasers in good faith;" and, although the principle, *noscitur a sociis*, would operate to require the word, "creditors," in the first clause, to have the same meaning which is ascribed to the same word in the second clause; yet, for the reasons already stated, while regarding the second clause as a statute of estoppel, and being of opinion that the word, "creditors," as there used, means subsequent creditors, we, nevertheless, are constrained to hold that the first clause is a statute of evidence, and that the word, creditors, as there used, means either prior, or subsequent, creditors.

III. If we are right in these views, it is not strictly necessary, for the purpose of the decision of this case, to notice any other question. We deem it proper, however, to notice one error of the circuit court, in order that, by drawing attention to it, its possible repetition in other cases may be prevented. Against the objections of the defendant, the court allowed the plaintiff to amend his petition at the trial, by interlineation, so as to claim damages for loss of time while attending to this cause, and for attorneys' fees in the cause, and the court instructed the jury that, in estimating the plaintiff's damages, they might take into consideration his loss of time and the payment by him of attorneys' fees. These rulings were erroneous. The *gravamen* of this action is the total conversion of the plaintiff's goods. The action

is, therefore, analogous to an action of trover, and the measure of damages which should be applied is, consequently, that which is applicable in actions of trover, which is the value of the property at the time of the conversion, with legal interest to the date of the judgment. No authority is cited to us which sustains the giving of damages for expenses of litigation in actions of this kind. The cases of replevin, and of actions upon attachment bonds, are not analogous.

Being of opinion that the circuit court erred in submitting the case to the jury, our decision is, that the judgment should be reversed, and that the cause should not be remanded, as, in our opinion, a reversal, without remanding, will have the effect of a judgment as of nonsuit. But, because our decision is in conflict with the decision of the Kansas City court of appeals, in the case of *Worley ex rel. v. Watson* (22 Mo. App. 546), it is ordered that this cause be certified to the supreme court, under the provisions of section six, of the constitutional amendment, adopted at the general election, November 4, 1884. Rombauer, J., concurs ; Lewis, P. J., is absent.